IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2025

## STATE OF TENNESSEE v. MICHAEL DENVER RICHARDSON

**Appeal from the Criminal Court for Davidson County**
**No. 2021-A-369      Angelita Blackshear Dalton, Judge**

_____

### No. M2024-00393-CCA-R3-CD
_____

A Davidson County jury convicted the Defendant, Michael Denver Richardson, as charged of first degree premeditated murder, and he was sentenced to life imprisonment. On appeal, the Defendant argues: (1) the trial court improperly admitted four of his prior convictions for impeachment purposes; (2) the trial court erred in admitting certain evidence at trial; (3) the trial court erred in denying his motion for judgment of acquittal; (4) the trial court erred in denying jury instructions on self-defense and defense of another; and (5) cumulative error requires reversal of his conviction. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Timothy Carter, Nashville, Tennessee, for the appellant, Michael Denver Richardson.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Around midnight on December 1, 2020, the Defendant fired multiple shots through his front door at the victim, Marvin Lewis, who died from his injuries. In March 2021, the Davidson County Grand Jury indicted the Defendant for one count of first degree premeditated murder.

**Trial.** We have summarized only the portions of trial relevant to the issues raised. Christopher Alceus, an officer with the Metro Nashville Police Department, testified he

responded to a shots-fired call, arrived at the crime scene at 309 35th Avenue, North, unit B in Nashville, observed the victim's body, and talked with several witnesses. He stated that around 2:20 a.m. on December 1, 2020, the Defendant pulled up to the crime scene in a silver SUV, which matched the description of the vehicle that three female witnesses had seen speeding away following the gunshots. Officer Alceus said the Defendant exited the car, placed his hands above his head, and walked toward him while identifying himself. He immediately observed that the Defendant had "an odor of an alcoholic substance on his person" and declined to answer any questions. Upon searching the Defendant, Officer Alceus found thirteen .45 caliber rounds in the Defendant's pocket.

William Willis testified that he and his girlfriend, who lived two houses down from the crime scene, heard some gunshots around midnight on December 1, 2020. Willis first heard three or four gunshots and then he heard another group of three or four gunshots, which prompted him to look out the window of his apartment. Willis then saw the Defendant, who was his neighbor, standing in the doorway of the Defendant's home while holding a gun and firing three or four shots into the air. Willis notified his girlfriend, who called 9-1-1. While his girlfriend was taking to the dispatcher, they heard additional gunshots that were fired as one or two shots and then a pause, and then one or two more shots.

On cross-examination, Willis said that earlier in the day on November 30, 2020, he observed Ellis Leggs arguing with another man on the front porch of the Defendant's apartment. However, Willis told officers that it was not out of the ordinary for such argument to occur at the Defendant's residence. Willis said that when he observed the Defendant firing shots into the air around midnight on December 1, 2020, the Defendant appeared to be firing "warning shots."

On redirect examination, Willis said the argument between Ellis and the other man, who was not the Defendant, at the Defendant's residence occurred at 4:00 or 5:00 p.m.

Hailey Cunningham and Reilly Wolski both testified that they lived a couple of blocks down from the scene. They stated that shortly after midnight on December 1, 2020, they were awakened by multiple gunshots. Approximately five minutes later, they heard some additional gunshots. Cunningham said her roommate texted that she saw a police car, so she looked out the window, and the detective investigating the case saw her and motioned for her to come downstairs to be interviewed. Wolski stated that after hearing the second round of gunshots, she looked out her window and saw a silver SUV driving away, although she did not see anyone getting into the SUV.

Doris Carter testified that she had dated the Defendant for approximately ten years until August 2020. She recalled that the Defendant called her in the early hours of

- 2 -

December 1, 2020, from an unknown number and told her he had gotten himself "in some trouble" at Ellis Leggs' house. At the time, Carter did not believe the Defendant was in trouble. Carter called Ellis, who handed the phone to a police officer at the scene, and Carter told the officer what the Defendant had just told her about getting into trouble.

John Terry, a civilian employee with the crime investigation unit of the Metro Nashville Police Department, testified that he responded to the crime scene in the early morning hours of December 1, 2020. He stated that the deceased victim was still at the scene when he arrived. Terry took photographs of the scene and used a FARO digital scanner to capture the scene. At the scene, he observed seven .45 caliber cartridge casings, three live rounds of .45 caliber ammunition, and a Glock magazine. In the Defendant's bedroom, Terry observed a .45 caliber Glock between the bed side table and the bed that had a misfeed, which is a bullet that did not properly load into the chamber of the gun.

Terry noted eight perforating defects on the front door of the apartment from bullets that went from the inside of the apartment all the way to the outside. He also stated that there was a peephole in this door. Terry also found two .45 caliber cartridge casings that were outside the home at the bottom of the stairs and three .45 caliber cartridge casings in the threshold area of the door. He also found several copper-jacketed projectiles outside the apartment.

Shawn Taylor, a crime scene investigator with the Metro Nashville Police Department, testified that he helped process the crime scene. When the medical examiner rolled the victim's body over, Investigator Taylor found two additional cartridge casings and collected them

On cross-examination, Investigator Taylor collected the .45 caliber Glock from the scene. He noted that although this Glock had a light on it, he did not have to turn the light off when he collected it.

Scotty Archibald testified that on December 1, 2020, he was living at 309 35th Avenue, North, unit B with the Defendant, Michael Woods, Ellis Leggs, and Keyon Douglas. When Archibald and Douglas came home shortly before midnight on December 1, 2020, Woods opened the door for them because they did not have a key. A short time later, Archibald heard footsteps and a loud banging at the back door and then at the front door. He then heard a man in a calm voice asking for "Mr. Mike," although he did not know which Mike he was looking for. Archibald did not recognize the voice of the man on the other side of the door. He replied that "Mr. Mike" was not there, and the man outside asserted that "Mr. Mike's truck was parked outside." Archibald then told the Defendant that a man was asking for him at the door. The Defendant instructed Archibald to tell the man outside that he was not there. When Archibald told the man outside that no Mike lived

there, the man responded, "Mike's truck is outside" and said that he had left his cell phone in Mike's truck. He did not look through the peephole while conversing with the man.

Archibald said that after the Defendant told him to inform the man outside that there was no Mike living at that residence, the Defendant went into his bedroom. Archibald did not see the Defendant come out of his bedroom because Archibald was still at the door trying to talk to the man outside. Archibald stated that after telling the man outside that there was not a Mike at that residence, the Defendant appeared with a gun in his hand and told him to move away from the door, and he complied. Archibald then "heard a gun click and started to hear shooting." He dropped to the floor facedown with his hands over his head. He stated he did not know how many were fired. Once the gunshots stopped, he ran into the Douglas's bedroom. Archibald awakened Douglas and Leggs and told them to get out of the house, and they all exited the house through the front door while the Defendant was in his bedroom. Archibald, Douglas, and Leggs ran to Douglas's Lexus, got in, and drove away. A short time later, the three men returned to their home, and the police were there. Archibald said that although he talked to officers that night, he did not go into as much detail as he had just testified about because he was "fresh from being incarcerated" for aggravated assault.

On cross-examination, Archibald stated that he had never seen the Defendant with a gun prior to that night. He said although the man asking for the Defendant was calm, this man had loudly banged on the front door. Archibald asked who was outside, and when the man did not respond, Archibald yelled for him to identify himself, even though he was pretty sure the man outside heard him the first time. Archibald asserted that he spoke loudly enough the second time that the Defendant cut his music down in his room and walked to Archibald. Archibald confirmed that the man on the other side of the door said, "We are looking for Mike," which gave him the impression that there were several people outside. When Archibald said that no Mike lived there, the Defendant "looked shocked" when he learned that the man outside was looking for him. Archibald asked the man outside what he wanted, and the man replied that he left his cell phone in "Mr. Mike's car." At that point, Archibald said this man was no longer banging on the door or jiggling the door handle. The Defendant told Archibald that there was no cell phone in his truck, and when Archibald relayed this information to the man outside, the man stopped talking, which made him "a little worried" because it was late and this man had not identified himself. Archibald said that the Defendant told him to step aside, and then he heard a "click" and heard the gunshots the Defendant fired through the door, which caused Archibald to drop to the ground for several minutes before he ran to wake up his roommates. Archibald agreed that after the first round of shots through the door, he saw the Defendant standing outside shooting and aiming at someone or something in the direction of 35th Avenue. He noted that the Defendant seemed to be shooting around the corner, which made him believe that there were other people outside, even though he did

not see them. He also thought there was more than one person outside because he heard someone banging on the back door and then, an instant later, heard someone banging on the front door.

Archibald said that after the Defendant fired these shots, he went back in his bedroom, and Archibald, Douglas, and Leggs exited the home and jumped over the victim's body before leaving the property. As they passed in front of their home, Archibald observed a gray four-door Chevrolet sedan with the passenger door open.

Archibald said that the Defendant's firing of his gun made him feel safe because he did not know the man on the other side of their front door and did not know why he was there. He agreed that the Defendant being armed and repelling the danger outside was a good thing.

On redirect examination, Archibald admitted he did not know why the Defendant told him to inform the man outside the door that the Defendant was not there. He confirmed that he did not know the man outside their door. Archibald considered anyone he did not know to be a danger to him.

Michael Woods testified that he lived at 309 35th Avenue, North, unit B the night of the shooting. On the night of November 30, 2020, he heard a knock on the door, and when he asked who it was, Archibald asked for him to let him in because he did not have his keys. Before opening the door, Woods looked through the front door's peephole to ensure that it was Archibald, and after confirming it was him, he let Archibald and a second person into the house. Woods later went to bed and was awakened around midnight on December 1, 2020, when he heard five or six gunshots fired from ten feet away. He heard the shooter reloading right outside his door before Woods heard a second round of five or six gunshots fired. After this second round was fired, he heard a door close, although he never heard any voices. Woods ran into his closet and heard a third round of gunshots and then heard a door being forcefully closed. While he was hiding, Woods tried to contact the Defendant via text because he was afraid someone had broken into the house and had shot the Defendant. Woods said the Defendant never responded, and he never called anyone or 9-1-1 because he was afraid the shooter was still in the house. Woods continued to hide in the closet for approximately ten minutes until Ellis Leggs called and gave his phone to police officers, who told him it was safe to exit the home. As he exited the home, Woods looked in the Defendant's bedroom, and although the door was open and the lights were on, the Defendant was not in there. When Woods exited the home, he saw the victim, who he did not know, lying face down. He stated that it was odd he did not hear anyone during the incident because if they were getting robbed and the Defendant was getting shot, he would have expected to hear the Defendant or his other roommates.

Woods said the Defendant returned to the home a couple of hours after he heard the gunshots. At the time, Woods knew there was a deceased victim, but he did not know who had fired the shots, and he did not learn what happened until the next day. Woods said that the night of this incident, he did not know the Defendant owned a firearm. Woods also stated that he had never known the Defendant to be afraid to answer the door.

On cross-examination, Woods said that unlike his other roommates, the Defendant did not have guests over to the house. Woods acknowledged that there was a light on their front porch, and that when looking out of the front door's peephole, this porch light would illuminate the side of a person's face who was standing in front of the door. He stated that the Defendant had previously lived at 309 35th Avenue, North, unit B, with Doris Carter. However, the Defendant and Carter moved out together and then the Defendant later moved back into the residence.

Woods noted that earlier in the day on November 30, 2020, he heard Ellis Leggs having an argument with someone at the front door of his house. They were screaming and yelling obscenities at each other, but Woods could not tell why they were arguing. Woods said it was not common for Leggs to be involved in an argument at their home.

Woods acknowledged he had previously stated that the second and third rounds of gunshots that night seemed farther away from him than the first round of shots. When Woods exited the home, he told officers that he did not see anyone inside. He acknowledged that he never saw the Defendant the night of November 30 and December 1 until the Defendant returned to the house and was arrested. Woods acknowledged that with the porch light on, a person could see people standing in front of the door through the peephole "[p]retty well."

Marian Owens testified that she met the victim at a moving company where she worked, and they had been friends since the 1980's. Owens said the last time she saw the victim was on November 30, 2020, when he showed up at her partner's funeral with the Defendant. At the time, she knew the victim and the Defendant worked together.

On cross-examination, Owens said that the Defendant, the victim, and William Corder left the funeral at the same time.

Regina Wilson testified that she had known the victim for twenty years and had dated the victim for three or four years prior to the victim's death. Wilson stated that the victim often rode with the Defendant to work. On November 30, 2020, she recalled the Defendant picking up the victim to go to a funeral. Wilson said that the victim returned home around 10:00 p.m. that night with William Corder. As they were talking, the victim told her he bought a "big bottle" of liquor and had left the liquor and his cell phone in the

Defendant's truck. The victim then asked if he could borrow Wilson's car, a gray Chevy Cavalier, to get his phone and the liquor, and Wilson gave him her car keys, and the victim left. At that time, Corder also left to meet one of Wilson's friends and returned to the victim's house a little after 12:30 a.m. Corder asked if the victim had shown up, and Wilson told him he had not. At that point, she and Corder tried to call the victim, but he never answered.

On cross-examination, Wilson agreed that the victim and the Defendant were "good friends." She said the victim made sure to share food he cooked with the Defendant and allowed the Defendant to borrow money. She said the victim "never" complained that he and the Defendant had any issues in early November 2020.

Dr. Erin Carney, a forensic pathologist and the deputy chief medical examiner for Davidson County, was accepted as an expert in the field of forensic pathology. Dr. Carney performed the autopsy on the victim and determined that the victim sustained four gunshot wounds. One gunshot wound entered behind the victim's right ear, severing the spinal cord from the brain and tearing through the victim's jugular vein. The victim also sustained two shots to his torso, one to the right side of his chest and one to the right side of his abdomen. The fourth gunshot wound was to the top of the victim's right thigh. Dr. Carney said that the bullet that severed the victim's spinal cord and cut off the brain from the rest of the body was what killed the victim. She noted that while all the bullets traveled in a downward trajectory, the gunshot wounds to the victim's body entered the victim's front and traveled to his back and the gunshot wound behind the victim's ear traveled from the back of the victim's body to the front. Dr. Carney opined that the victim's cause of death was multiple gunshot wounds and that the victim's manner of death was homicide.

On cross-examination, Dr. Carney acknowledged that she found no gunpowder stippling on the victim's body, which was consistent with the gun being fired from farther than three feet away or with something being between the gun and the victim that blocked the gunpowder from reaching the victim's skin. She also stated that all the bullets entered the victim's body and came to a rest in the victim's body, rather than traveling through the victim's body. She acknowledged that it was possible for a .45 caliber bullet to go through a victim's body if the bullet did not hit anything hard that could slow it down. Dr. Carney stated that two of the bullets had "a plastic piece . . . in the middle of the bullet" and a "deformity of the metal," and stated this plastic may have been "picked up" by the bullets but explained some bullets are made with plastic pieces. She clarified that her determination that the victim's death was a "homicide" was not a legal determination and simply meant that the victim died at the hands of another person.

On redirect examination, Dr. Carney said that the victim was wearing two layers of pants, which could have prevented soot or stippling, even if the gun was fired near the

victim. She stated that certain types of bullets, including hollow-point bullets, have plastic in them that is not completely covered with the metal jacket at the point of the bullet.

On recross-examination, Dr. Carney acknowledged that there was nothing on the victim's clothing like burn marks or gunshot residue that you would expect to find with a close gunshot wound.

Lisa Whitaker, a forensic scientist and a firearm and tool mark examiner with the Metro Nashville Police Department Crime Laboratory, was accepted as an expert in the field of firearm and tool mark identification. Whitaker testified that some hollow-point bullets have a little piece of plastic or polymer in the nose of the bullet. She stated that she examined and test-fired the Glock .45 caliber handgun collected in this case. She noted that although the Glock did not have a magazine with it, she was still able to test fire it. Whitaker analyzed the twenty-two cartridge cases collected from the scene against the test-fire cases from the Glock handgun and determined that all these cartridge cases had been fired through the Glock handgun. She also determined that the six projectiles that were collected at the crime scene were fired through the Glock handgun. Moreover, she concluded that the four bullets collected from the victim's body during the autopsy were fired from the Glock handgun. Whitaker asserted that of the bullet fragments and projectiles collected from the scene and the victim's body, some were "jacketed hollow-point bullets" and some were just "round-nose bullets." She noted that the bullet recovered from the victim's back was a "total metal jacket design" while the bullets from the victim's buttock, leg, and neck were "jacketed hollow-point[s]."

On cross-examination, Whitaker confirmed that the jacketed hollow-point bullets recovered from the victim's buttock, leg, and neck had red polymer tips on them. She confirmed that she placed the bullets into the Glock handgun directly into the chamber to fire them and did not use a reference magazine from the crime laboratory.

Chad Gish, a detective with the digital forensic section of the Metro Nashville Police Department, was accepted as an expert in digital technology. Detective Gish testified that he conducted a full digital extraction of the data from the Defendant's cell phone and the victim's cell phone. Detective Gish noted that on November 1, 2020, at 12:32 a.m., the Defendant sent a text message to Pooka, later identified as Doris Carter, asking her if she had been "talking to" the victim. He also stated that on November 3, 2020, the Defendant sent the victim a photograph of a Glock pistol and two Glock magazines.

Detective Gish noted that on November 30, 2020, at 9:12 p.m., the Defendant sent a text message to someone identified as Sweet Pea that stated, "I need you." The Defendant also sent a message to Sweet Pea on November 30, 2020, at 9:52 p.m. that said, "I got 160." Detective Gish explained that the Defendant got Sweet Pea's number by doing an online

search for an escort service. He stated that in addition to these text messages, the Defendant also made phone calls to the individual identified as "Sweet Pea."

On cross-examination, Detective Gish stated that on November 3, 2020, the Defendant sent the victim threatening text messages and then sent the victim a photograph of a Glock and two Glock magazines. The same day, the Defendant sent the victim a video with the statement, "Care about self first." Detective Gish interpreted this video as the Defendant threatening the victim. He said there were numerous phone calls between the Defendant and the victim on November 3, 2020, around the time that the Defendant sent the threatening texts to the victim. Detective Gish stated that there was a 197-second conversation between the Defendant and the victim around 9:00 p.m., and then the Defendant and the victim spoke again the next morning, beginning at 7:00 a.m. He noted that on November 4 and 5, there were morning and afternoon conversations between the Defendant and the victim. He also said the Defendant and the victim spoke hundreds of times between November 3, 2020, and November 29, 2020. Detective Gish stated that on November 30, 2020, there were several phone conversations between the victim and the Defendant, although most were made in the late afternoon and early evening.

Madison Meiss, a detective with homicide unit of the Metro Nashville Police Department, testified that she was the lead detective in this case. Detective Meiss stated that Ellis Leggs, Scotty Archibald, Keyon Douglas, Michael Woods, and the Defendant were all interviewed by officers at the scene. Doris Carter was also interviewed by Detective Dickerson over the phone.

When Detective Meiss entered the Defendant's room, she observed an E&J Liquor bottle to the right of the television and a cell phone next to the Defendant's bed, which she collected. She later determined that this cell phone belonged to the victim. Detective Meiss stated that while on the scene, the officers determined it was appropriate to charge the Defendant with homicide, and he was arrested and transported to police headquarters.

Detective Meiss obtained a search warrant for the Defendant's vehicle, a silver 2016 Dodge Journey. She noted that a red cell phone was found in the floorboard of this vehicle by the gas pedal, and this cell phone was collected.

Detective Meiss stated that on November 3, 2020, at 8:09 p.m. the Defendant sent the victim a message, "I'll bust a n[---]a head. On sight. Try me but look at my artillery." Based on her training and experience, Detective Meiss interpreted this text as being "very threatening" toward the victim. She stated that the phrase "on sight" generally meant that the person was planning to "cause some physical harm" to the other person "as soon as they see them[.]" At 8:12 p.m. on that date, the Defendant sent the photograph of the Glock, two magazines, and a box of ammunition with five of the ammunition rounds

missing to the victim. Detective Meiss said she was aware that a Glock handgun was found in the Defendant's home. At 8:16 p.m. that evening, the Defendant sent the victim the following text: "Care about self first." She stated that the Defendant's call records did not show a phone call or text to Doris Carter on November 30, 2020, after 9:00 p.m.

Detective Meiss stated that on November 1, 2020, the Defendant had texted Doris Carter asking if she was "talking to" the victim. Carter replied to the Defendant, "You faked it to make me fall in love with you," and the Defendant responded, "If so, I've falled [sic] in love and it hurts bad, worser [sic] than my baby mama, and I don't know how. . . . I love you [more] th[a]n any person on earth. Just forget it." Thereafter, Carter then stated, "What, I would never, ever talk to any of your friends." The Defendant replied, "I love you always. Naw, he just called me talking about chill. Do f[-]ck." Carter responded, "Yeah, controlling purposes." Carter then texted:

> Look, I've tried thousands of times to show you and prove to you who I am. You gave me some smart insights, but I don't agree to everything you gave, and I don't like your spirit. It's negative and very hurtful at times.

> I love you, but I can't love you the way you are. Not the same person I fell in love with. . . . Whatever, Mike, Sambo, bo, big Mike, Michael Richardson. Whoever you are tonight."[1]

Based on her training and experience, Detective Meiss interpreted this text conversation as the Defendant accusing Doris Carter of "talking to" the victim, and Doris Carter responding that the Defendant was being "controlling and jealous" and that she would not talk to one of his friends. Detective Meiss added that there seemed to be conflict between the Defendant and Doris Carter concerning "her relationship with [the victim]." Detective Meiss said that it was "extremely relevant" that this text conversation between the Defendant and Doris Carter took place less than forty-eight hours before the Defendant sent the threatening photograph of the Glock gun and magazines to the victim. Detective Meiss confirmed that the victim did not have any weapons on his person or in his vehicle.

On cross-examination, Detective Meiss acknowledged that she never talked to Doris Carter about the November 1 and November 3 texts. Detective Meiss stated that the November 1 and November 3 texts appeared to be about some sort of conflict in the relationship between Doris Carter and the Defendant that had to do with the victim. When asked if Detective Meiss was using her own "deduction" to reach that conclusion about the texts, Detective Meiss replied it was her training and experience that led her to this

---

[1] After this evidence was presented, defense counsel renewed his objection to this proof, and the trial court stated that the defense's objection was "noted."

conclusion about the meaning of these text messages. Detective Meiss acknowledged that she could have talked to Doris Carter about the November 1 and 3 text messages. She acknowledged that Doris Carter testified at this trial that she did not know the victim well.

Detective Meiss said the E&J bottle of liquor in the Defendant's room was significant because Regina Wilson and other witnesses interviewed had stated that the victim was drinking E&J liquor the night of November 30, 2020, when he left in the Defendant's car. She conceded that she was not able to definitively say that the bottle of liquor found in the Defendant's room had anything to do with the victim.

Detective Meiss stated that the phone call records showed that the Defendant and the victim had multiple phone calls between November 3, 2020, and December 1, 2020. She agreed that some of the phone calls between the Defendant and the victim were long and that both the Defendant and the victim initiated these calls. Detective Meiss also stated that the records showed that after the Defendant sent the November 3, 2020 texts to the victim, the victim did not respond. However, she agreed there were phone calls exchanged between the Defendant and the victim on November 3, 2020, in between those text messages.

On redirect examination, Detective Meiss stated that she reviewed all the text messages between Doris Carter and the Defendant during the period of November 1, 2020, and determined that the Defendant's question about whether Carter was "talking to" the victim was significant because prior messages between the Defendant and Doris Carter had concerned Doris Carter's alleged infidelity. Detective Meiss said that the Defendant specifically referenced Doris Carter "cheating on him" and "sleeping with somebody else." Detective Meiss agreed that during this entire text conversation, the only name that was mentioned was the victim's name.

On recross-examination, Detective Meiss acknowledged that while some text messages between the Defendant and Doris Carter contained accusations of Carter's infidelity, these messages did not mention the victim's name. She agreed that it was several days later when the Defendant asked Doris Carter if she was "talking to" the victim.

At the conclusion of trial, the jury found the Defendant guilty as charged of first degree premeditated murder, and the Defendant received a sentence of life imprisonment. The Defendant timely filed a motion for new trial and several amendments, arguing, in pertinent part, that the trial court erred in ruling that certain prior convictions were admissible for impeachment purposes; that the trial court erred in admitting certain evidence; that the trial court erred in denying his judgment for motion of acquittal; that the trial court erred in denying his oral request for a defense of another instruction; and that

cumulative error required a reversal of his conviction. Following a hearing, the trial court denied the motion for new trial. Thereafter, the Defendant timely filed a notice of appeal.

## ANALYSIS

**I. Admission of Convictions for Impeachment Purposes.** The Defendant argues that the trial court improperly admitted four of the Defendant's convictions for impeachment purposes. He claims all four of these convictions were "time-barred pursuant to [Rule] 609(b)" because more than ten years had lapsed between the dates of incarceration for the prior convictions and the commencement of this prosecution and that these convictions should be "held to [the] high[er] standard in regard to their prejudicial effect" than convictions under ten years, despite the prior notice from the State. In response, the State argues that the trial court properly exercised its discretion in ruling that these four prior convictions were admissible for the purpose of impeachment. The State claims that for the three convictions that were less than ten years old, the trial court properly determined their probative value as to the Defendant's credibility outweighed their danger of unfair prejudice. The State asserts that for the single burglary conviction that was older than ten years, the trial court acted within its discretion in admitting this conviction for impeachment purposes based on the conviction's strong probative value as a crime of dishonesty and its low danger of unfair prejudice. We conclude that the trial court properly admitted all four prior convictions for impeachment purposes.

In support of this claim, the Defendant argues the State failed to provide proper documentation of these convictions, which should void the trial court's ruling. He also asserts that there was little probative value gained from allowing the jury to hear about a crime of dishonesty from so long ago, and that the State's notice approximately one month prior to trial did not constitute sufficient advance notice required by Rule 609(b), at least regarding his older out-of-state convictions, because this notice did not allow for defense counsel to sufficiently investigate whether the facts and circumstances supported the convictions' admissibility. Moreover, the Defendant claims the trial court failed to make an adequate record of how the probative value of these convictions substantially outweighed the unfair prejudicial effect under Rule 609, regardless of whether these convictions were a crime of dishonesty. The Defendant contends that the trial court's errors regarding the use of these convictions for impeachment purposes resulted in his not taking the witness stand at trial, which prevented him from utilizing his desired self-defense strategy.

This court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003). A trial court "'abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard,

(2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.'" State v. Reynolds, 635 S.W.3d 893, 921 (Tenn. 2021) (quoting Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010)). If this court concludes that a trial court erred by deeming proof of a prior conviction admissible, then this issue will be reviewed for harmless error. Waller, 118 S.W.3d at 374.

The Tennessee Rules of Evidence permit the admission of a prior conviction to impeach the credibility of a defendant who testifies at trial. Tenn. R. Evid. 609(a)(3). "'[E]vidence' of a prior conviction admissible under Rule 609(a) is limited to the fact of a former conviction and the crime that was committed" and does not permit admission of the details of the offense. State v. Taylor, 993 S.W.2d 33, 34 (Tenn. 1999). "If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial[.]" Tenn. R. Evid. 609(a)(3). The trial court shall rule on the admissibility of the prior conviction before the accused testifies. Id. "If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination." Id. In addition, the accused is not required to make an offer of proof about his contemplated testimony to show that he would have testified if not for the trial court's ruling. State v. Galmore, 994 S.W.2d 120, 125 (Tenn. 1999). However, "[d]epending upon the facts and circumstances of a case, an offer of proof may be the only way to demonstrate prejudice." Id.

To be admissible for impeachment purposes, the conviction must be for a crime: (1) punishable by death or incarceration in excess of one year under the law under which the person was convicted, or (2) involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). In explaining the distinction between these two categories, this court has stated, "To be eligible as an impeaching conviction, a prior felony conviction need not involve dishonesty." State v. Osborne, 251 S.W.3d 1, 22 (Tenn. Crim. App. 2007) (emphasis in original) (internal quotation marks and citation omitted). The trial court "upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). Trial courts have been repeatedly instructed to "explicitly state their reasons for allowing or disallowing the admission of prior conviction evidence for the purpose of impeachment so the appellate courts may properly determine the rule has been followed in reaching the decision." State v. Long, 607 S.W.2d 482, 485 (Tenn. Crim. App. 1980).

Trial courts should engage in a two-prong analysis when determining whether the probative value of the impeaching conviction outweighs its unfair prejudicial effect on the substantive issues. Trial courts are required to expressly (1) "assess the similarity between the crime on trial and the crime underlying the impeaching conviction" and (2) "analyze the relevance the impeaching conviction has to the issue of credibility." State v. Farmer,

841 S.W.2d 837, 839 (Tenn. Crim. App. 1992) (internal quotation marks and citation omitted); see State v. Herron, 461 S.W.3d 890, 906 (Tenn. 2015). This court has held that "[t]he mere fact a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citations omitted). However, when the impeaching conviction is the same as the crime for which the accused is being tried, the unfair prejudicial effect on the substantive issues greatly increases. State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

However, a more stringent standard is applied when the impeaching conviction is stale, meaning that more than ten years have elapsed "between the date of release from confinement and commencement of the action or prosecution," or if the witness was not confined, more than ten years have elapsed between "the date of conviction" and the commencement of the action or prosecution. Tenn. R. Evid. 609(b). In this scenario, the prior conviction is admissible for impeachment purposes "if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence" and the trial court "determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Id. (emphasis added). The theory underlying this ten-year rule is that "a person's criminal deeds long ago may have little bearing on the person's credibility today" because "[t]he individual may have matured considerably and learned from the experiences engendered by the conviction." State v. Chism, No. W2002-01887-CCA-R3-CD, 2003 WL 23100335, at *6 (Tenn. Crim. App. Dec. 23, 2003) (citation and internal quotation marks omitted). This more stringent standard generally results in the exclusion of evidence of the stale conviction. State v. Smith, No. 910, 1990 WL 157419, at *4 (Tenn. Crim. App. Oct. 19, 1990) ("Rule 609(b) creates, in effect, a rebuttable presumption that convictions over ten years old are more prejudicial than helpful and should be excluded.").

"A procedural claim under Rule 609 challenges the process the trial court utilized to reach its decision, rather than the decision itself;" on the other hand, "a substantive claim under this rule challenges the trial court's weighing of the probative value against the unfair prejudicial effect as well as the resulting decision to admit or exclude the prior conviction." State v. Lankford, 298 S.W.3d 176, 181 (Tenn. Crim. App. 2008). If a trial court fails to comply with the procedural requirements of Rule 609, then the court's decision to admit or exclude a prior conviction is not entitled to deference by the reviewing court, and the appellate court must independently determine the admissibility of the impeaching conviction based on the proof presented. Id. at 182.

Here, the defense filed a pre-trial motion pursuant to Rule 609 to prohibit the State from introducing, during its case-in-chief or as impeachment, any evidence of the

Defendant's prior convictions. Thereafter, the State filed a notice of intent to use the following convictions or prior bad acts for impeachment purposes: 2012 Florida convictions for burglary, grand theft, and criminal mischief under $200, and a 2013 Tennessee conviction for facilitation of bribery of a public servant. The State then filed an amended notice of intent to use the following additional convictions: a 1999 Maryland conviction for burglary and a 1997 Maryland conviction for transport/wear/carry handgun.

Immediately prior to the start of trial, the trial court considered the State's amended notice of intent to use the Defendant's prior convictions for impeachment purposes under Tennessee Rule of Evidence 609. The court noted that even if the conviction at issue was older than ten years, it could still be used for impeachment purposes if the State gave notice to the defense and if the trial court determined that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighed its prejudicial effect. See Tenn. R. Evid. 609(b).

Regarding the Defendant's 2013 conviction for facilitation of bribery of a public servant, the trial court held that that the State provided notice for his conviction, the prior conviction was less than ten years old, this prior conviction was not prejudicially similar to the charged offense, this conviction went to the Defendant's truthfulness, and that the probative value of this conviction was not outweighed by any prejudicial effect.

As for the Defendant's 2012 Florida felony convictions for burglary of a structure and grand theft, the trial court found that there was a probative value for these convictions because they related to the Defendant's truthfulness and that the probative value of these convictions was not outweighed by any prejudicial effect because these prior convictions differed from the charged offense.

Lastly, regarding the Defendant's 1999 Maryland felony conviction for burglary, the trial court noted that it was an "older" conviction. However, the trial court found that the State had provided notice, that this prior conviction had probative value because it went to the Defendant's "truthfulness"; and that this "probative value" was "not outweighed" by any unfair prejudice because the nature of the burglary conviction differed from the charged offense in this case.

The trial court determined that the State could not use the Defendant's 2012 Florida misdemeanor conviction for criminal mischief or the Defendant's 1997 Maryland conviction for a weapons charge. Defense counsel objected at trial to the trial court's ruling regarding the admissibility of the Defendant's four prior convictions for impeachment purposes.

- 15 -

At the motion for new trial, defense counsel asserted that the trial court ruled that "even though [several convictions] were remote in time, some of them over 10 years old[, they] were still able to be used [for impeachment purposes] because there was sufficient prior notice given to the defense[.]" Defense counsel then asked the trial court "to re-evaluate [its] opinion" on the admissibility of the four prior convictions based on the law cited in his motion and memorandum of law. The State responded that there was "only one conviction that was over that 10-year period" and that the remaining three were "all within the 10 years." Regarding the defense's claim that it did not have sufficient notice to investigate the underlying conduct, the State asserted that "the conduct was a certified judgment of a guilty plea, so the only way to argue that [this conviction] was not . . . conduct the Court would find credible [would be to argue that the Defendant] lied when he entered the guilty pleas." The State also noted that it gave "over a month's notice on" the 1999 Maryland burglary conviction and that this conviction was only six months beyond the ten-year time period. Lastly, the State argued that the trial court "appropriately weighed whether or not the probative value outweighed that short time frame." The trial court, in its order denying the motion for new trial, held that "[q]uestions regarding the admissibility of [the Defendant's] prior convictions for impeachment purposes were litigated in a hearing outside the presence of the jury" and "the Defendant has failed to provide legal authority demonstrating error."

Here, the Defendant was indicted in this case for first degree premeditated murder on March 17, 2021. The Defendant entered guilty pleas to burglary of a structure and grand theft in Florida on April 24, 2012, and received a fourteen-month sentence in incarceration, with 46 days of credit for time served. In addition, the Defendant entered a guilty plea to facilitation of bribery of a public servant in Tennessee on January 18, 2013. Even if we calculate from the guilty plea/conviction date to the date of this indictment, all three of these convictions occurred within ten years of the commencement of prosecution for the instant crime, which means these three convictions are admissible if the State gave "reasonable" notice and the probative value of these convictions outweighed the danger of unfair prejudice. Tenn. R. Evid. 609(a)(3).

These three convictions fulfill these requirements. On April 5, 2023, approximately one month prior to trial, the State provided notice of its intent to use all three of these convictions for impeachment purposes. The three convictions at issue are for burglary, theft, and facilitation of bribery, which are all crimes of dishonesty. See Lankford, 298 S.W.3d at 181 n.1 (reiterating that "the offenses of burglary and theft are highly probative of credibility because these crimes involve dishonesty"). Crimes of dishonesty are "highly probative of credibility." Baker, 956 S.W.2d at 15 (internal quotation marks and citation omitted).

Moreover, these convictions for burglary, theft, and bribery were not unfairly prejudicial because they were not similar in nature to the instant first degree premeditated murder charge. We agree with the State that none of the three prior convictions involved violence or the use of a gun, which significantly lowers the prejudicial effect of the use of these convictions for impeachment purposes. Accordingly, we conclude that the trial court did not abuse its discretion in holding that the probative value of these three convictions outweighed their prejudicial effect.

As for the fourth conviction, the 1999 Maryland conviction for burglary/theft, we will analyze it under the more stringent admissibility standard because there was more than ten years between the date of the conviction and the commencement of the prosecution in this case. Under this more stringent standard, the State's written notice of this conviction needed to be sufficient, and the probative value of this conviction needed to substantially outweigh its prejudicial effect. See Tenn. R. Evid. 609(b). The record shows the State identified this fourth conviction in its amended written notice on April 18, 2023, approximately three weeks prior to trial. This notice included the trial court's case number for this conviction and the specific county and court in Maryland where it occurred, which enabled the Defendant to obtain documentation regarding this conviction. Although the Defendant claims he had insufficient time to investigate whether the facts and circumstances supported the convictions' admissibility, he fails to show why three weeks' notice was insufficient for him to properly investigate this conviction, especially given the specific information provided by the State. Therefore, we conclude that the State's notice of this conviction was sufficient.

Because the trial court applied the less stringent standard when evaluating this the 1999 Mayland conviction, it failed to comply with the procedural requirements of Rule 609, and the trial court's decision to admit this prior conviction is not entitled to deference by this court. When considering whether the probative value of this 1999 Maryland burglary/theft conviction substantially outweighed the prejudicial value, we note that this conviction is a crime of dishonesty and, consequently, is highly probative of a Defendant's credibility. See id. In addition, this conviction is dissimilar to the first degree premeditated murder charge in this case, which reduces the unfair prejudicial effect on the substantive issues. See Farmer, 841 S.W.2d at 839. Therefore, we conclude that the trial court did not err in admitting the 1999 Mayland conviction for impeachment purposes.

**II.  Admission of Evidence.**  The Defendant also contends that the trial court erred in admitting certain evidence at trial. Specifically, the Defendant claims the trial court erred in admitting texts between the Defendant and Doris Carter and texts between the Defendant and the victim. The Defendant also contends that the trial court erred in allowing Detective Meiss to opine on the Defendant's state of mind in text messages between the Defendant and Doris Carter and erred in admitting texts between the

Defendant and a possible female escort. He claims that the admission of this evidence "complicated [his] decision to testify" and prevented him from "utiliz[ing] a self-defense argument." In response, the State argues that the trial court acted within its discretion in admitting this evidence because it had some tendency to make a fact of consequence more or less probable than it would be without the evidence and because none of this evidence carried a particularly high risk of unfair prejudice. We agree with the State.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). As the Tennessee Supreme Court recognized,

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below . . . or to substitute their discretion for the lower court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

Lee Med., Inc., 312 S.W.3d at 524 (citations omitted).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "'Excluding relevant evidence under [Tennessee Rule of Evidence 403] is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" State v. James, 81 S.W.3d 751, 757-58 (Tenn. 2002) (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)).

- 18 -

At the motion for new trial hearing, defense counsel merely relied on its motion for new trial for his arguments concerning this proof. The State argued that the text messages at issue were relevant to the conflict between the victim and the Defendant shortly before the victim's death. The State also asserted that the text message with the photograph of the Glock handgun was obviously a threat. In its order denying the motion for new trial, the trial court held that "[i]ssues regarding the evidence related to the cell phone extractions and text messages were litigated outside the presence of the jury and that "[the Defendant] has failed to provide legal authority demonstrating error."

First, the Defendant argues that the trial court erred in admitting texts between the Defendant and Doris Carter. In the first text conversation on November 1, 2020, the Defendant asked Doris Carter if she had been "talking to" the victim, and Doris Carter replied that she would "never ever talk to any of [the Defendant's] friends" and that although she loved the Defendant, he was not the same person she had fallen in love with. In the text conversation that occurred on November 3, 2020, the Defendant sent the victim a picture of a Glock and threatened to shoot him "on sight." The Defendant argues that the State attempted to use these two text conversations to suggest that the Defendant wanted to kill the victim because he was jealous of the victim's relationship with Doris Carter. However, he claims that these two unrelated text conversations were irrelevant to the charged crime. He also contends that it was prejudicial for these text conversations to be combined to create a motive for the Defendant to murder the victim. The Defendant also asserts that Doris Carter's text messages should not have been admitted because they were not statements made by the Defendant.

In a jury-out hearing, the State argued the November 1, 2020 texts between the Defendant and Doris Carter provided "context [as] to why [the Defendant] would be threatening the victim" on November 3, 2020. Defense counsel countered that that the November 3, 2020 texts, wherein the Defendant threatened the victim, were not relevant because they did not reference Doris Carter or any issue with Carter and because Carter told the Defendant on November 1, 2020, that she would "never" talk to one of the Defendant's friends.

To support its argument for the admissibility of these texts, the State argued that the only text messages for a two-month period between the Defendant and the victim were the ones where the Defendant sent a picture of a gun and threatened the victim, even though there were 200 phone calls between the Defendant and the victim. The State also noted that the victim never responded to the Defendant's November 3, 2020 threatening text message and that the only other reference to the victim's name in the Defendant's phone was when the Defendant asked Doris Carter if she had been "talking to" the victim. The State asserted that this evidence was relevant to why the Defendant might shoot the victim.

- 19 -

The trial court reasoned that if the threatening November 3, 2020 text from the Defendant to the victim was introduced, then the November 1, 2020 text from the Defendant to Doris Carter about whether she had been "talking to" the victim "could fill a conceptual void in the jury's understanding of why [the Defendant] would send the [threatening] text message on [November 3]." The court then stated that it would allow the November 1, 2020 text messages "for that limited purpose."

We conclude that the trial court properly admitted the November 1, 2020 text conversation between the Defendant and Doris Carter. The State's theory at trial was that the Defendant shot and killed the victim because he believed the victim was involved in a romantic relationship with Doris Carter. The November 1, 2020 text conversation included the Defendant asking Carter if she was "talking to" the victim and Carter replying that she would "never ever talk to any of [the Defendant's] friends." This text conversation took place only a few weeks before the Defendant fatally shot the victim. This text conversation is relevant because it tended to make the State's theory concerning the Defendant's motive to kill the victim more probable than it would be without the evidence. See Tenn. R. Evid. 401. We also conclude that the Defendant failed to show that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Therefore, we conclude the trial court did not abuse its discretion in admitting the November 1, 2020 text conversations between the Defendant and Doris Carter.

Second, the Defendant argues that the trial court erred in admitting texts between the Defendant and "a possible female escort." Although the Defendant claims the State presented these texts for identification purposes only, to be introduced as impeachment evidence if the Defendant testified, the record shows these texts were admitted as substantive evidence. The Defendant argues that the purpose of introducing these texts was to show that he had no reasonable grounds to fear someone coming to his home late at night, such as the victim coming for his cell phone on November 30, 2020, because the Defendant had already invited the female escort to come to his home around 10:00 p.m. on November 30, 2020. The Defendant asserts that the texts to the possible female escort were irrelevant because they did not help the jury determine whether the Defendant killed the victim with premeditation. He also claims that the trial court should not have admitted these texts until they became relevant at trial. The Defendant acknowledges that if he testified, the texts could have been used to impeach him as to the reasonableness of his shooting through the door in self-defense without checking to see who was on the other side.

On cross-examination, the defense elicited testimony from Archibald that it was unusual for people to come to the house late at night and that Archibald was frightened by the individual outside the door. The defense presented this evidence to suggest to the jury that the Defendant was reacting to a threat outside the door when he fired the shots.

During a jury-out hearing at trial, the State asked to introduce November 30, 2020 text messages between the Defendant and a female escort with a 615 area code who went by the name "Sweet Pea." In these text messages, the Defendant asked how much Sweet Pea charged for the entire night, and she responded, "HR 160." At 9:12 p.m. on November 30, 2020, the Defendant texted Sweet Pea, "I need you." Then, at 9:52 p.m. on November 30, the Defendant texted Sweet Pea, "I got 160" and had previously given her his address. The State argued that although defense counsel argued in his opening statement that the Defendant was paranoid, was constantly moving homes, did not want people to know where he lived, and was afraid to have strangers over, the Defendant invited a female escort over to his home the night he shot the victim. The defense objected to the specific texts that talked about exchanging money, meeting up, and the charge per hour. The State asserted that Detective Gish would testify that the Defendant did a Google search on his cell phone on November 12, 2020, to find Sweet Pea's number as an escort. The defense countered that these texts would be prejudicial and would indicate the Defendant's desire to engage in criminal activity. Ultimately, the trial court held that because the defense had opened the door by asserting that the Defendant was afraid of anyone being at his house, it would allow the State to present these text messages, although it instructed the prosecutor not to make "a huge deal [of] it." The State promised that Detective Gish would explain how the female escort's number was connected to the Defendant's internet search and that Detective Meiss would describe the substance of the text messages between the Defendant and the female escort.

The proof that the Defendant arranged for possible female escort to come to his house close to midnight on November 12, 2020, and again at 10:00 p.m. on November 30, 2020, the night of the victim's shooting, shows that the Defendant did have late night visitors to his home and challenges the defense's proof suggesting that the Defendant automatically feared anyone who was outside his home late at night. Because these texts show that the Defendant frequently had a female escort visit him late at night, including his request that she visit him two hours before the shooting in this case, we conclude that these text messages were relevant because they made evidence that the Defendant was fearful of late-night guests at his home less probable. We also conclude the Defendant failed to show that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Accordingly, we conclude the trial court did not abuse its discretion in admitting the text messages between the Defendant and the probable female escort.

Third, the Defendant argues that the trial court erred in allowing Detective Meiss to provide an opinion regarding the meaning of the November 1, 2020 texts between the Defendant and Doris Carter, which included the Defendant asking if Carter was "talking to" the victim. After noting that Detective Meiss interpreted these texts as the Defendant's

jealousy over a potential relationship between Doris Carter and the victim, the Defendant argues that even if the defense's objection to Detective Meiss's testimony was properly overruled, the trial court should not have allowed Detective Meiss to opine concerning the possible meaning of these text messages because they were not relevant based on their remoteness and because the texts, which made vague references to drugs, were unfairly prejudicial under Rule 403. Instead, the Defendant claims the trial court could have allowed the State to argue at closing about the texts' possible meaning or could have allowed the State to introduce these text messages only after the Defendant testified. The Defendant insists there was no proof he had a reason to threaten the victim and no evidence of a disagreement between them a month prior to the victim's death.

On direct examination, the State asked Detective Meiss to explain the significance of these texts to her investigation in this case. When Detective Meiss replied that it appeared, based on her training and experience in homicide investigations, that the Defendant was "accusing" Doris Carter of talking to the victim in these texts, the defense objected to Detective Meiss making "any inferences" about the meaning of these text messages. The prosecutor explained that she was asking Detective Meiss why these text messages were "relevant to the investigation" and the "time frame" in this case. The trial court ultimately ruled that it would allow this evidence for its effect on Detective Meiss's mind at the time she read the texts, "which led to her further investigation." Detective Meiss then opined that these text messages showed "some sort of conflict about [Doris Carter's] relationship with [the victim]" and "seemed to be related to the November 3, 2020 text messages between the Defendant and the victim, which contained a photograph of a Glock handgun, wherein the Defendant "appeared to be threatening the victim."

The Defendant argues that the trial court erred in allowing Detective Meiss to provide an opinion regarding the meaning of the Defendant's November 1, 2020 text messages to Doris Carter. However, Tennessee Rule of Evidence 701(a) provides that a lay witness may provide opinions or inferences that are "rationally based on the perception of the witness" and are "helpful to . . . the determination of a fact in issue." At trial, Detective Meiss testified about her evolving investigation and offered her opinion regarding the meaning of the texts to explain why she investigated the case in the way she did. Detective Meiss's opinion about the meaning of these texts allowed her to connect the perceived conflict between the Defendant and Doris Carter on November 1, 2020, to the threatening messages the Defendant sent to the victim on November 3, 2020, and then connect this evidence to the victim's fatal shooting on November 30, 2020, which was less than one month later. We conclude that Detective Meiss's opinion about the meaning of these text messages was relevant because it made the proof suggesting that the Defendant fired his gun out of fear less probable and made the proof suggesting that the Defendant killed the victim with premeditation more probable. We also conclude that the Defendant failed to show that the probative value of Detective Meiss's opinion was substantially

- 22 -

outweighed by the danger of unfair prejudice. Clearly, Detective Meiss's opinion was rationally based on her perception and was helpful to the determination of a fact in issue. Therefore, we conclude that the trial court did not abuse its discretion in admitting Detective Meiss's testimony concerning her opinion as to the meaning of these texts.

Fourth, the Defendant contends that the trial court erred in admitting, over the defense's objection, testimony from Detective Gish concerning a series of texts between the Defendant and the victim and between the Defendant and a possible female escort. Regarding the Defendant's November 3, 2020 texts from the Defendant to the victim, which included a photograph of a Glock handgun, the Defendant argues that these texts should not have been admitted because there was no proof the Defendant was threatening the victim and no relevance between the November 3, 2020 texts and the victim's death, which took place nearly a month later. He also argues that these texts included references to drug use, which was prejudicial under Rule 608. Regarding the texts between the Defendant and a possible escort, the Defendant argues they were inadmissible because they constituted a prior bad act, were not relevant to the facts in this case, and violated Rule 608. The Defendant argues that because the possible female escort did not respond to the Defendant's November 30, 2020 texts, these texts did not support the State's theory that the Defendant was not fearful around midnight on December 1, 2020, because he was expecting company from the female escort that night.

Detective Gish testified that on November 3, 2020, the Defendant sent a series of texts to the victim, wherein he told the victim he would "bust a . . . head on sight," sent a photograph of his Glock handgun followed by a photograph of the victim with the caption "care about self[,]" and insulted the victim several times before telling the victim to "try" him. We agree with the State that these texts show conflict between the Defendant and the victim. Moreover, the November 3, 2020 texts are particularly relevant when viewed with the Defendant's November 1, 2020 texts to Doris Carter, which include the Defendant's suspicion that Doris Carter and the victim were romantically involved. When these texts are viewed together, they suggest that the Defendant was angry with the victim because he believed the victim and Doris Carter seeing each other romantically, which made it more probable that the Defendant acted with premeditation in killing the victim. Therefore, we conclude that the November 3, 2020 texts are relevant. We also conclude that the Defendant has failed to show that the probative value of these texts was substantially outweighed by unfair prejudice. In addition, although the Defendant argues that Rule 608 should have kept out one of the text messages vaguely referencing drug use, Rule 608 provides guidelines for when specific instances of conduct may be used to impeach a witness's character for truthfulness but does not affect the admission of proof for substantive purposes during the State's case-in-chief. We agree with the State that the trial transcript clearly shows that the State did not introduce this evidence to impeach the

Defendant's character for truthfulness but introduced it to show that the Defendant acted with premeditation in killing the victim.

Moreover, we conclude that Detective Gish's testimony concerning the series of texts between the Defendant and a possible female escort were relevant. These texts show that the Defendant frequently had a female escort visit him late at night and show that the Defendant requested that the female escort visit him two hours before the shooting. This proof was relevant because it made it less probable that the Defendant was fearful of late-night guests at his home. Lastly, to the extent the Defendant claims that Rule 608 should have prevented the admission of texts between the Defendant and a possible female escort, we likewise conclude that the State did not introduce this evidence to impeach the Defendant's character for truthfulness but introduced it to for the purpose of establishing the Defendant's motive and premeditation. Therefore, we conclude that the trial court did not abuse its discretion in admitting Detective Gish's testimony concerning these text messages.

**III. <u>Denial of Motion for Judgment of Acquittal.</u>** The Defendant contends that the trial court erred in denying the motion for judgment of acquittal on the first degree premeditated murder charge. Specifically, he argues that even when the evidence is viewed in the light most favorable to the State, no facts were presented to show that the Defendant acted with premeditation. The Defendant claims that although the State presented text messages to suggest that the Defendant acted with premeditation in killing the victim, these text messages were so remote in time to the killing that they should have been excluded as irrelevant. The Defendant also asserts that the evidence at trial showed that he and the victim were seen together without issue earlier that night and that Scotty Archibald said he was very fearful when the victim, who did not identify himself, asked for the Defendant outside their front door the night of November 30, 2020. Consequently, the Defendant argues that the trial court erred in denying the motion for judgment of acquittal on the first degree premeditated murder charge and erred in not allowing the case to proceed on the lesser included offenses. In response, the State maintains that the trial court properly denied the motion for judgment of acquittal because the trial proof showed the Defendant fired multiple shots through the front door at the unarmed victim and then walked outside and fired several additional shots. We agree with the State.

At the conclusion of proof at trial, defense counsel made a motion for judgment of acquittal on the first degree premeditated murder charge, claiming the State failed to present any proof that this was a premeditated murder. The trial court held, based on the testimony of Scotty Archibald and William Willis who were present the night of the shooting, that "a prima facie case ha[d] been made for the indicted charge of premeditated murder."

At the motion for new trial hearing, the State asserted that the proof presented in this case was that the victim was "talking in a calm voice, that he was outside of the locked door, [and] that he was knocking on the door." The State additionally argued:

> [The victim] was asking for [the Defendant] and saying that he had left his cell phone in [the Defendant's] car, which [the Defendant] was friends with [the victim]. They had been together earlier that evening. [The victim] did, in fact, leave his phone in his car.

In its order denying the motion for new trial, the trial court held that "[t]he issues were litigated in a hearing outside the presence of the jury" and that "the Defendant . . . failed to provide legal authority demonstrating error."

We recognize that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction[.]" State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005) (citing State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences

- 25 -

to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379. When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2019). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d) (Supp. 2019). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006) (citing Bland, 958 S.W.2d at 660); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660. In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

At trial, Scotty Archibald testified that when the victim at the front door calmly asked for the Defendant because the victim had left his cell phone in the Defendant's truck, the Defendant instructed Archibald to tell the victim that the Defendant was not at home. When Archibald relaying this untruth to the victim, the Defendant left the foyer area and went into his bedroom. When the Defendant returned from his room, Archibald heard a gun "click," and the Defendant told Archibald to get out of the way. Archibald then saw the Defendant fire multiple shots through the closed door at the victim. Thereafter, the

- 26 -

Defendant walked outside and fired several more shots, appearing to aim at someone or something. Archibald acknowledged that he heard the Defendant reloading his gun several times during this incident. When Archibald fled the area, he noted that the Defendant was sitting calmly in his bedroom. Archibald's testimony clearly established that the Defendant obtained his weapon, told Archibald to get out of the way before opening fire, fired numerous gunshots through the front door at an unarmed and unaware victim, and failed to render aid to the victim following this shooting. The victim sustained four gunshots wounds, and the State presented strong evidence that the Defendant fired his gun at least twenty-two times that night. Given this proof, a rational jury could have found that the Defendant acted with premeditation in killing the victim.

Although the Defendant challenges the weight of the State's evidence and attempts to accredit his own proof that Archibald was fearful that night and that the Defendant and the victim had no conflict earlier that day, we refuse to reweigh the evidence or to substitute our inferences for those drawn by the jury. See Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659). Because the evidence is sufficient to support the Defendant's conviction for first degree premeditated murder, we conclude that the trial court acted properly in denying the Defendant's motion for judgment of acquittal.

**IV. Self-Defense and Defense of Others.** Next, the Defendant contends that the trial court erred in not providing an instruction on self-defense or defense of another to the jury based on the testimony of Scotty Archibald, who he claims provided proof that the Defendant acted in fear of a home invasion when he shot the victim. The Defendant argues that he should not have to sacrifice his Fifth Amendment right not to testify in order to receive a self-defense or defense of another instruction, especially given Archibald's strong testimony at trial. Lastly, the Defendant asserts that Doris Carter's testimony about the Defendant's problems with his ex-wife, which the trial court refused to admit at trial, would have "provided context and reference to [the] fear of harm that [the Defendant] was always under" and would have "laid a foundation" for Archibald's testimony that the Defendant acted in fear of a home invasion "instead of making it seem like the Defendant fired his gun to murder (as oppose[d] to defend against) the person at the door." He asserts that Doris Carter's testimony about the Defendant's problems with his ex-wife was just as relevant, if not more relevant, than the month-old text messages that the Defendant sent to Doris Carter asking if she had been "talking to" the victim. In response, the State argues that the trial court properly declined to give the defense of others instruction because the proof did not fairly raise this defense. We conclude that the trial court did not err in not instructing on self-defense and defense of another because the evidence in this case did not fairly raise these defenses.

"[Q]uestions involving the propriety of jury instructions are mixed questions of law and fact[.]" State v. Cole-Pugh, 588 S.W.3d 254, 259-60 (Tenn. 2019). Accordingly, this court's standard of review is de novo with no presumption of correctness. Id. at 260.

A criminal defendant has "'a constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial.'" Id. (quoting Cauthern v. State, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004)). "In criminal cases, a trial court's duty to accurately instruct the jury on relevant legal principles exists without request." State v. Benson, 600 S.W.3d 896, 902 (Tenn. 2020) (citing State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013)). "This obligation extends to general defenses, such as self-defense, defense of another, or defense of a habitation." Hawkins, 406 S.W.3d at 129 (footnote omitted). "'[T]he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge.'" State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (quoting State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). An instruction is "'prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" State v. Perrier, 536 S.W.3d 388, 403 (Tenn. 2017) (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)).

A trial court need not submit "[t]he issue of the existence of a defense . . . to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c); Benson, 600 S.W.3d at 904; Hawkins, 406 S.W.3d at 129. However, "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable." Tenn. Code Ann. § 39-11-203, Sentencing Comm'n Cmts. The Tennessee Supreme Court held that self-defense is a "general defense" and that "the quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." Hawkins, 406 S.W.3d at 129; see Perrier, 536 S.W.3d at 403. "When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor." Benson, 600 S.W.3d at 903 (citing Hawkins, 406 S.W.3d at 129). When admissible evidence fairly raises a general defense, the trial court must submit the general defense to the jury, and at that point the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply. Hawkins, 406 S.W.3d at 129; see Perrier, 536 S.W.3d at 403. If a defense instruction is submitted to the jury, "the court shall instruct the jury that any reasonable doubt on the issue requires the defendant to be acquitted." Tenn. Code Ann. § 39-11-203(d).

Self-defense is a complete defense to an offense. Id. § 39-11-601; State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). At the time of the offenses in this case,

Tennessee Code Annotated section 39-11-611(b), which outlines self-defense, provided the following:

> (1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2020).

> In addition, "defense of another" is defined as follows:
>
> A person is justified in threatening or using force against another to protect a third person, if:
>
> (1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and
>
> (2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612. As used in this statute, a person's reasonable belief means "the defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified[.]" State v. Bult, 989 S.W.2d 730, 732 (Tenn.

Crim. App. 1998). In other words, "the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." Id.

"The application of the right to defend another should be 'determined in the same fashion as the right of self-defense' under Tenn. Code Ann. § 39-11-611." Hawkins, 406 S.W.3d at 128 (quoting Tenn. Code Ann. § 39-11-612, Sentencing Comm'n Cmts.). "A person's right to defend a third party is no greater than the third party's right to defend himself or herself." Id. at 128-29.

During a jury-out hearing at trial, defense counsel asked for the pattern jury instruction 40-07, defense of a third person, based on Archibald's testimony indicating that he was in fear for his life until the Defendant fired his gun. See Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40-07. The State countered that there had been no testimony that the victim "was acting in any way that would cause another to fear serious bodily injury or death." The State then argued:

> [The victim] said he had left his phone in [the Defendant's] truck. He was told [the Defendant] wasn't there. [The victim] asked again. Mr. Archibald was very specific that he was no longer jiggling on the doors. He was no longer banging on the door. He was just talking. [Archibald] actually said that [the victim] was talking calmly, is how he described it, and there's nothing about any of that that the State feels would warrant self-defense to be instructed at this point.

Defense counsel responded that Archibald testified that he had some incidents in his past that made him fearful under these circumstances, that the Defendant was "in shock when having this discussion about who was at the door," and that "[the Defendant] told [Archibald] to . . . move out of [the] way before [he] began [firing the shots]." The court stated, "[If Archibald had] been the one who shot based on those circumstances, I could definitely see a self-defense or defense of others argument." The court also said that it was trying to determine how Archibald's state of mind had an impact on the Defendant.

Defense counsel then argued, "But the . . . jury pattern instruction [for defense of another] just states that under the circumstances that the person reasonably believes them to be, the person would be justified . . . in threatening or using force to protect against the use [or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected]." When the trial court asserted that the person in question was the Defendant because he was the person who discharged the weapon, defense counsel acknowledged the court's point but nevertheless argued that the defense of another instruction should be given to the jury.

- 30 -

The trial court then stated, "I read [the defense of another instruction] to mean that the person that they're referring to in [the pattern jury instruction] is the defendant and not a third party[.]" It then said, "It's hard for me to tell from the proof the way that it's been presented . . . I don't know that [the Defendant] is going to testify . . . [which] could change things." However, the court stated that it was "not suggesting [that the Defendant should testify]." The court explained, "[Y]ou're asking me to base this on Mr. Archibald's testimony, and I just don't think the proof rises to that when the person, as referenced in this [pattern instruction], is the [D]efendant and not Mr. Archibald." Defense counsel replied that it understood that the court was denying his request at this time, but asked if the trial court would reconsider this issue if the Defendant testified. The trial court agreed that if the Defendant testified, "that could change things."

Defense counsel argued that a person could "not only [be] defending himself but others in the household; hence the, "Get out of the way before I shoot the door." Although the court agreed with "that aspect," it held that it would "depend on how the proof goes from this point forward." The court agreed to take this issue "under advisement pending the further proof that comes in[.]"

At the motion for new trial, defense counsel argued that although Archibald "unexpectedly testified that he was in great fear, and that he felt very grateful that [the Defendant] was able to use a weapon to defend against what he thought was a dangerous situation," the trial court denied the jury instruction on defense of another. The State countered that Archibald admitted he did not know that the Defendant and the victim were friends and that Archibald believed that the victim might be trying to lure the Defendant outside for some ill purpose only because he did not know him. The State also argued that Archibald did not know that the Defendant and the victim had been together earlier that night or that the victim had, in fact, left his cell phone in the Defendant's car. Moreover, the State noted that on redirect examination, Archibald admitted that if he had known all those things, he would not have been in fear that night. The State asserted "there was no indication from the totality of the evidence that there was any defense of others because [the Defendant] knew [the victim]. They were friends[.]" The State reiterated that "[t]here were no threats made" and that the victim "was just knocking at the door asking to get his cell phone." The trial court, in its order denying the motion for new trial, held that "[t]his issue was litigated in a hearing outside the presence of the jury, with the Court's rulings stated from the bench," and "[the Defendant] has failed to provide legal authority demonstrating error."

We conclude that the evidence did not fairly raise self-defense or defense of another. Here, the Defendant argues that the trial court erred in not providing these instructions because Scotty Archibald's testimony provided sufficient proof that the Defendant acted in fear of a home invasion when he shot the victim. Although Archibald testified on cross-

- 31 -

examination that he believed the man outside the door was dangerous, Archibald also testified that the man outside his front door calmly asked for the Defendant and explained that he had left his cell phone in the Defendant's truck.

We conclude that Archibald's trial testimony was insufficient to raise the issue of self-defense. Based on Archibald's testimony, the Defendant would not have had a reasonable belief that there was an imminent danger of death or serious bodily injury. Archibald testified that while the victim initially knocked loudly on the door, the victim spoke calmly when he asked for the Defendant and was not knocking loudly or rattling the door handle when Archibald began speaking to him. We agree with the State that "a man asking for his cell phone from the other side of a locked door, even at midnight, is not the sort of threat that reasonabl[y] leads to a fear of death or serious bodily injury." Because the evidence did not fairly raise the issue of self-defense, we conclude the trial court properly declined to give this instruction to the jury.

We likewise conclude that Archibald's trial testimony was insufficient to raise defense of another. There was no proof suggesting that the Defendant reasonably believed intervention was immediately necessary to protect Archibald. Archibald never told the Defendant he was afraid, and there was no proof that Archibald behaved in a way that showed he was fearful of the man outside the door. In addition, there was nothing in Archibald's testimony concerning the victim's actions that would have caused the Defendant to believe that firing his gun through a closed door at the victim was necessary to protect Archibald. Because the proof at trial did not fairly raise the defense of another, we conclude the trial court properly declined to provide this instruction to the jury.

Lastly, the Defendant appears to claim the trial court erred in prohibiting him from asking Doris Carter about the Defendant's issues with his ex-wife. At trial, when defense counsel asked Doris Carter about the Defendant's problems with his ex-wife, the State objected on relevance grounds. During a bench conference, defense counsel argued that the Defendant "believe[d] he was being stalked by his ex-wife" and that Doris Carter had witnessed this stalking in the past and could testify about it. Defense counsel claimed that this stalking was why the Defendant "moved from location to location," which Carter could also verify. When the trial court asked what that evidence had to do with the shooting of the victim, defense counsel replied, "As to what [the Defendant's] state of mind would be when he was at the door." The court then stated, "But that would probably only come into play if [the Defendant] testifies." When defense counsel asked if he could recall Doris Carter if the Defendant testified, the trial court held that it was sustaining the State's objection for now. When defense counsel later asked if the State would object to his asking if Carter knew of any problems the Defendant had with his ex-wife, the State again objected, and the trial court indicated that this line of questioning "would fall under the

same category" and "would only become relevant if [the Defendant] brings up his state [of mind]."

To the extent the Defendant also challenges the trial court's ruling that Carter could not testify about the Defendant's troubles with his ex-wife, the Defendant is not entitled to relief. Here, the Defendant failed to make an offer of proof concerning Carter's testimony on this issue. See Tenn. R. Evid. 103(a)(2) (requiring a party seeking admission of the evidence to make an offer of proof unless the substance of the evidence and the evidentiary basis supporting the evidence's admission is apparent under the circumstances). Here, the Defendant failed to make an offer of proof, and it is not apparent from the context of the record what the Defendant intended to show by presenting this evidence. Moreover, the Defendant failed to include this issue in his motion for new trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. App. P. 3(e) ("Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Accordingly, we conclude the Defendant has waived this issue.

**V. Cumulative Error.** Lastly, the Defendant contends that even if none of these errors standing alone entitled him to relief, the cumulative effect of these errors to so great that it requires a reversal of his conviction. The State counters that cumulative error relief is not warranted in this case. We agree with the State.

In its order denying the motion for new trial, the trial court made the following findings and conclusions:

> In the present case, in order to find the cumulative error doctrine applicable, the Court must have found errors on each individual claim. For reasons discussed supra, the Court has found that [the Defendant] has failed to demonstrate error on each individual claim. As such, the Court finds that the cumulative error doctrine inapplicable.

The cumulative error doctrine recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. Id. at 77. Because we

have concluded that there were no errors committed during the trial proceedings in this case, the Defendant is not entitled to relief under the cumulative error doctrine.

## **CONCLUSION**

Based on the aforementioned authorities and reasoning, the judgment of the trial court is affirmed.

s/ Camille R. McMullen

CAMILLE R. MCMULLEN, PRESIDING JUDGE